UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
AUG 11 2014
MICHAEL J. ROEMER, CLERK
WESTERN DISTRICT OF NY

---

DIANE PALUMBO,

            Plaintiff,

    v.

CAREFUSION 2200, INC., and OLIVER
"WHIT" CHAMPAGNE,

          Defendants.

**DECISION AND ORDER**

12-CV-06282 EAW

---

## INTRODUCTION

Plaintiff Diane Palumbo ("Ms. Palumbo" or "Plaintiff") is a former employee of defendant Carefusion Resources, LLC ("Carefusion")[1] who was supervised by defendant Oliver "Whit" Champagne.   She alleges that she was discriminated against on the basis of her age during the course of her employment.  She brings claims pursuant to both the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* (the "ADEA"), and the New York State Human Rights Law, N.Y. Exec. L. §§ 290 *et seq.* (the "NYSHRL").

Plaintiff's complaint alleges seven causes of action: (1) disparate treatment under the ADEA; (2) hostile work environment under the ADEA; (3) retaliation under the ADEA; (4) disparate treatment based on age under the NYSHRL; (5) hostile work environment based on age under the NYSHRL; (6) retaliation under the NYSHRL; and

---

[1]    Carefusion is incorrectly identified in the complaint as "Carefusion 2200, Inc." (Dkt. 28 at 2).

(7) aiding and abetting the unlawful discrimination and retaliation in violation of the NYSHRL by Mr. Champagne. (Dkt. 1 at 27-49). Defendants move for summary judgment on each of these claims. For the reasons set forth below, Defendants' motion for summary judgment is granted as to Plaintiff's ADEA disparate treatment and retaliation claims against Mr. Champagne, and as to Plaintiff's ADEA and NYSHRL hostile work environment claims against Mr. Champagne and Carefusion. The motion is denied in all other respects.

## BACKGROUND

Plaintiff Diane Palumbo was born on September 19, 1955, and is currently 58 years old. (Dkt. 34-1 at ¶ 2; 34-4 at 16:22-24). She was first hired by a predecessor of Carefusion as a field service representative in June 1996. (Dkt 34-1 at ¶¶ 5, 7; 39-7 at 2-3). As a field service representative, she assisted sales representatives and collected accounts from hospitals in the Rochester region. (Dkt. 34-1 at ¶ 7). Within the organization (which by then was known as Cardinal Health), Ms. Palumbo eventually became a sales representative for "V. Mueller" surgical instruments. (*Id.* at ¶¶ 10-12). As a V. Mueller sales representative, she was responsible for territory covering Sayre and Troy, Pennsylvania, and all of New York State except for New York City, Long Island, Poughkeepsie, and Westchester and Rockland Counties. (*Id.* at ¶¶ 13, 14). Ms. Palumbo's territory was the largest territory serviced by the Northeast sales team and her

2

customer list included approximately 92 hospitals and surgery centers. (*Id.* at ¶15) Cardinal Health became Carefusion in approximately 2009-2010. (*Id.* at ¶ 22).

Defendant Oliver "Whit" Champagne became the Northeast regional manager and Ms. Palumbo's supervisor in late 2008. (*Id.* at ¶ 24). Prior to this date, Mr. Champagne had also been a sales representative on the Northeast sales team. (*Id.* at ¶ 25). Ms. Palumbo claims that prior to Mr. Champagne becoming her manager, "[she] never received any formal disciplinary warnings, nor was [she] ever subjected to any formal discipline, and [she] was consistently commended for [her] performance and received regular merit-based pay raises." (*Id.* at ¶ 32).

Upon becoming the Northeast regional manager, Mr. Champagne purportedly called each sales representative individually to have a "first phone call" as the new manager. (*Id.* at ¶ 38). When he called Ms. Palumbo, he allegedly told her that "[the former supervisor] is no longer here to save your ass. I'm going to micro-manage the hell out of you, and this is the way it's going to be." (*Id.* at ¶ 39). Mr. Champagne allegedly did not speak to any other members of the Northeast sales team, all of whom were at least ten years younger than Ms. Palumbo, in this manner. (*Id.* at ¶ 41).

Ms. Palumbo claims that there were several instances in which a younger co-worker, Lauren Ghenn, called her "age-related derogatory names." (*Id.* at ¶ 45). Ms. Ghenn allegedly referred to Ms. Palumbo as "old fart" and "old lady," told her she smelled, and asked when she was going to get a wheelchair. (*Id.* at ¶¶ 45-47). Ms.

Palumbo claims there were three specific instances in which this behavior allegedly occurred and was witnessed by Mr. Champagne.  First, she claims that at a regional meeting, Mr. Champagne witnessed Ms. Ghenn saying "come on old lady, we've been waiting for you," and Mr. Champagne did not reprimand Ms. Ghenn.  (*Id.* at ¶ 48-49).  Second, Ms. Palumbo claims that at a 2010 national training meeting in Denver, she was walking to a restaurant with Mr. Champagne and Ms. Ghenn when Ms. Ghenn said "can't you walk any faster, old lady?"  (*Id.* at ¶ 50-51).  Ms. Palumbo claims that she told Ms. Ghenn she was sick of her rudeness and that Ms. Ghenn and Mr. Champagne responded by walking faster and leaving her behind.  (*Id.* at ¶¶ 52-53).  Finally, Ms. Palumbo claims that at a Carefusion national sales meeting, she was sitting at a table with Ms. Ghenn and Mr. Champagne when they began throwing items at various individuals in the room.  Ms. Palumbo claims she looked at them in surprise and Ms. Ghenn said "what's wrong, you old fart?"  Mr. Champagne and Ms. Ghenn then allegedly leaned towards each other and began whispering and laughing. (*Id.* at ¶¶ 54-60).

Ms. Palumbo also claims that Mr. Champagne spoke to her disrespectfully on several occasions.   On one occasion, she alleges that after she told him that it was going to be difficult to close a deal due to a competitor's price, he told her "I don't think I've ever been so fucking pissed in my life as I was [as a result of this conversation.]"  (*Id.* at ¶¶ 63-64).  Mr. Champagne also allegedly refused to answer her questions about using Excel, stating "you have already asked me this question, and I will only answer your

questions one time." (*Id*. at ¶ 66).   Ms.  Palumbo also alleges that on one occasion in 2009, Mr. Champagne yelled at her in front of several people for having allegedly failed to return a customer's call and asked her if all her customers were "assholes." (*Id*. at ¶¶ 68-72).   Mr. Champagne also allegedly failed to discipline a younger co-worker who drank heavily during a business trip and left Ms. Palumbo stranded at the airport.  (*Id*. at ¶¶ 74-77).   Additionally, on two occasions, Mr. Champagne allegedly made derogatory remarks about not liking traveling to Rochester to meet with Ms. Palumbo.  (*Id*. at ¶¶ 78-84).

Ms. Palumbo further alleges that she was denied training opportunities in favor of younger co-workers.   In particular, she claims that in 2009, she asked Mr. Champagne to attend training to become the plastics instrument specialist for the Northeast, but he instead sent her younger co-worker.  (*Id*. at ¶ 87-92).   Mr. Champagne also allegedly sent the same younger co-worker to the Association of Perioperative Registered Nurses Conference in 2009, despite Ms. Palumbo's requests to attend.  (*Id*. at ¶¶ 93-94).   Mr. Champagne also allegedly chose a younger coworker to participate in Carefusion's field trainer program in January 2011, despite that fact that Ms. Palumbo had outperformed this younger coworker in the previous fiscal year.  (*Id*. at ¶¶ 95-98).   Finally, Ms. Palumbo alleges that in March 2012, she asked to attend neuro-spine training, but that Mr. Champagne sent a younger coworker.  (*Id*. at ¶¶ 99-104).   Ms.  Palumbo also states

that at some unspecified point in time, Mr. Champagne sent two younger teammates to "negotiation training." (*Id.* at ¶ 106).

Ms. Palumbo did not meet her sales quota for fiscal year 2009. (*Id.* at ¶ 107; Dkt. 28 at ¶ 16). She received a performance review for fiscal year 2009 with an overall performance rating of "needs improvement." (Dkt. 28 at ¶ 16; Dkt. 34-1 at ¶ 112). Ms. Palumbo claims that two younger coworkers, including Ms. Ghenn, received ratings of "on target" despite similarly not having met their sales quotas. (Dkt. 34-1 at ¶ 112). Ms. Palumbo's performance review (which was completed by Mr. Champagne) stated: "[a]n area of improvement that Diane and I have spoken a lot about is communication and response to both internal and external requests. Multiple times I received calls from her customers looking for her and calls from both her customers and me were unreturned. Diane and I have spoken about this extensively and I expect this issue to be resolved immediately." (Dkt. 29-2 at 15). Ms. Palumbo claims that when she and Mr. Champagne met in Rochester to discuss this performance review, Mr. Champagne slammed a box of tissues on the table when she came in and said, "don't think your crying is going to get you anyplace." (Dkt. 34-1 at ¶ 114). Ms. Palumbo claims to have been surprised and offended by this comment because she was not crying at the time and does not recall ever crying in front of Mr. Champagne. (*Id.* at ¶¶ 113-16).

In October 2009, Mr. Champagne gave Ms. Palumbo a written warning for filing untimely expense reports. (Dkt. 29-2 at 20-21; Dkt. 34-1 at ¶ 117). Ms. Palumbo claims

that her expense reports were only occasionally slightly late, and that her coworkers on the Northeast sales team also occasionally turned in late expense reports, but were not reprimanded for doing so. (Dkt. 34-1 at ¶¶ 117-122).

Ms. Palumbo exceeded her sales quota and received an "on target" rating for her performance review for fiscal year 2010, which ran from July 1, 2009, through June 30, 2010. (Dkt. 29-2 at 23-24; Dkt. 34-1 at ¶ 126). In late 2010, however, Defendants claim that several of Ms. Palumbo's customers complained about her lack of responsiveness. Defendants assert that on October 19, 2010, Albany Medical Center, one of Plaintiff's customers, called Mr. Champagne to complain about Ms. Palumbo and asked to be assigned a new sales representative. (Dkt. 29-2 at 26). Defendants claim that Mr. Champagne tried to repair the relationship, but Ms. Palumbo missed a meeting with the same client in December 2010, further damaging the relationship. (Dkt. 28 at ¶¶ 26-27). Ms. Palumbo disputes this characterization of events. She claims that there was a miscommunication within Albany Medical Center in October 2010, that led to a delay in obtaining a custom order due to no omission or failure to respond on her part. (Dkt. 34-1 at ¶ 167-170). Ms. Palumbo further alleges that she did not intentionally miss a meeting in December 2010, but was forced to reschedule as a result of a snowstorm. (*Id.* at ¶¶ 172-183). Ms. Palumbo further claims that an individual named Carmen Ferraro at Albany Medical Center informed her that Mr. Champagne was soliciting phone calls and complaints from him. (*Id.* at ¶ 186). Ms. Palumbo admitted at her deposition in this

matter that Mr. Ferraro told Mr. Champagne that he did not want Ms. Palumbo as a representative any more, though she claimed that Mr. Ferraro did not mean it. (Dkt. 34-4 at 173:3-5, 12-15).

Ms. Palumbo's sales struggled in late 2010 and early 2011 – she ranked 49 out of 52 sales representatives nationwide in September 2010; 50 out of 52 in October 2010; 49 out of 52 in November 2010; 48 out of 51 in December 2010; and 46 out of 51 in January 2011. (Dkt. 29-2 at 33-42).

Defendants claim that due to these customer relationship and sales issues, Mr. Champagne began working with Carefusion's human resources department on a performance improvement plain ("PIP") for Ms. Palumbo in November and December 2010. (Dkt. 28 at ¶ 30). Defendants' records confirm that Mr. Champagne and Carefusion's HR department were planning the PIP during this time frame. (Dkt. 29-2 at 45-46). Defendants further allege that Mr. Champagne informed Ms. Palumbo in late January 2011 that he would be coming to see her to discuss the PIP. (Dkt. 28 at ¶ 31). On February 1, 2011, Mr. Champagne met with Ms. Palumbo to discuss the PIP. (*Id.* at ¶ 32).

Ms. Palumbo disputes Defendants' claims with regard to the PIP. She alleges that on November 4, 2010, she approached Mr. Champagne regarding his "rudeness and constant impatience" towards her and asked him to "step yelling at [her]." (Dkt. 34-1 at ¶¶ 132-133). Ms. Palumbo claims that Mr. Champagne acknowledged his behavior and

8

stated that he needed to work on it, but that his behavior actually got worse after this conversation. (*Id.* at ¶¶ 134-135).

On January 28, 2011, Ms. Palumbo filed an internal complaint of age discrimination and hostile work environment with Carefusion's MySafeWorkplace system. (*Id.* at ¶ 137). Ms. Palumbo alleges that she had not done so earlier because she was fearful of retaliation. (*Id.* at ¶ 138). Carefusion's HR department investigated Ms. Palumbo's complaint and found it unsubstantiated. (*Id.* at ¶ 140-41). Ms. Palumbo claims that the investigation was inadequate. (*Id.* at ¶¶ 142-145).

Ms. Palumbo further alleges that the first time Mr. Champagne mentioned the PIP to her was on February 1, 2011. (*Id.* at ¶ 153). She claims to have been very surprised about the PIP, and alleges that she was put on a PIP in retaliation for her MySafeWorkPlace complaint. (*Id.* at ¶ 154). According to Ms. Palumbo, Mr. Champagne told her he knew about the complaint. (*Id.* at ¶ 150).

Ms. Palumbo filed a complaint with the New York State Division of Human Rights on February 17, 2011, alleging employment discrimination on the basis of age (the "DHR Complaint"). (Dkt. 29-3 at 25).

Ms. Palumbo's PIP was originally scheduled to last for 60 days, but was extended on multiple occasions; it eventually ended in October 2011. (Dkt. 28 at ¶ 50; Dkt. 34-1 at ¶ 157). Defendants claim that the PIP was extended because Plaintiff was not meeting the performance objectives identified therein, while Plaintiff claims it was in retaliation

9

for her discrimination complaint. (Dkt. 28 at ¶ 50; Dkt. 34-1 at ¶ 159). Both Mr. Champagne and Ms. Palumbo rated her as "needs improvement" on her performance review for fiscal year 2011. (Dkt. 29-3 at 47).

Defendants allege that after being taken off the PIP, Ms. Palumbo continued to fail to respond to customers in a timely fashion. On October 13, 2011, Mr. Champagne received a request from Buffalo Mercy Hospital, one of Plaintiff's customers, for a product request that it had submitted to Ms. Palumbo over a month earlier. (Dkt. 29-3 at ¶ 60). Ms. Palumbo claims that this request came from an individual at Buffalo Mercy who did not know that Ms. Palumbo was communicating directly with the team lead nurse. (Dkt. 34-1 at ¶ 190).

In March 2012, Mr. Champagne received a complaint from Sharon Hoey at St. James Mercy Hospital claiming that Ms. Palumbo failed to keep appointments. (Dkt. 30 at 2). Ms. Palumbo denies having missed appointments and further states that if she was giving less attention to St. James Mercy, it was because Mr. Champagne had directed her to prioritize larger customers. (Dkt. 34-1 at ¶¶ 193-201). Ms. Palumbo also states that she was never told of this complaint or given an opportunity to explain or repair the situation. (*Id.* at ¶ 204). Mr. Champagne's contemporaneous email to HR states that he wants to "leave [Ms. Palumbo] out of the loop for the time being. . . ." (Dkt. 30 at 2).

On April 3, 2012, Guthrie Health, another of Ms. Palumbo's clients, informed Mr. Champagne that they did not want to work with Ms. Palumbo. (Dkt. 30 at 6-7). Mr.

Champagne allegedly informed Ms. Palumbo that Guthrie Health had made a complaint, but he did not tell her the substance of the complaint. (Dkt. 34-1 at ¶¶ 206-212). Ms. Palumbo claims she tried to find out what the complaint was about, but was unable to do so. (*Id.* at ¶¶ 213-214).

On April 4, 2012, Carefusion terminated Ms. Palumbo's employment. (*Id.* at ¶¶ 215-217; Dkt. 34-8 at 30). She was replaced by an individual who was 40 years of age. (Dkt. 28 at 66).

Plaintiff filed this lawsuit on May 24, 2012. (Dkt. 1). Defendants answered the complaint on July 27, 2012. (Dkt. 7, 8). Discovery closed on July 10, 2013. (Dkt. 22). Defendants moved for summary judgment on September 10, 2013. (Dkt. 27). Plaintiff filed a response on November 12, 2013 (Dkt. 34), and Defendants filed a reply on December 11, 2013 (Dkt. 41). Pursuant to an order of United States District Judge Frank P. Geraci, Jr. granting Plaintiff's request to file a sur-reply (Dkt. 40), Plaintiff filed a sur-reply on December 23, 2013 (Dkt. 44). This case was transferred to the undersigned on February 21, 2014. (Dkt. 48). Oral argument on the instant motion was heard on May 19, 2014. (Dkt. 51).

11

# DISCUSSION

## I.      Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).   Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'"  *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec.*, 475 U.S. at 586-87) (emphasis in original).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

## II.    Individual Liability under the ADEA

As a threshold matter, Defendants argue that all Plaintiff's ADEA claims must be dismissed as to Mr. Champagne because there is no individual liability under the ADEA. (Dkt. 31 at 7).  Plaintiff makes no response to this argument.

It is well-established that "there is no individual liability under *any* of the federal anti-discrimination statutes, including Title VII, the ADA, and the ADEA." *Garibaldi v. Anixter, Inc.*, 407 F. Supp. 2d 449, 451 (W.D.N.Y. 2006) (emphasis in original); *see also Cherry v. Toussaint,* 50 F. App'x 476, 477 (2d Cir. 2002) ("[T]he ADEA precludes individual liability.").  As such, Defendants' motion for summary judgment is granted as to all ADEA claims asserted against Mr. Champagne individually.

## III.    Disparate Treatment under the ADEA and the NYSHRL

Plaintiff's claim for disparate treatment under the ADEA is assessed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified by *Gross v. FBL Financial Services*, 557 U.S. 167 (2009).  Under this standard, plaintiff must establish a *prima facie* case of age discrimination by showing:  (1) that she was within the protected age group; (2) that she was qualified for the position; (3) that she experienced an adverse employment action; and (4) that the action occurred under circumstances giving rise to an inference of discrimination. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010).  If plaintiff is able to establish this *prima facie* case, the burden shifts to the defendant to articulate a

13

legitimate, nondiscriminatory reason for its actions. *Id.* at 106. "Once such a reason is provided, the plaintiff can no longer rely on the [*prima facie*] case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination." *Id.*

The final step of the analysis is where *Gross* becomes relevant. Before *Gross*, a plaintiff was required only to present evidence sufficient for a jury to find that the adverse employment action was motivated at least in part by her age. *Gorzynski*, 596 F.3d at 106. In *Gross*, the Supreme Court eliminated this mixed-motive analysis and held that "'a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action' and not just a contributing or motivating factor." *Id.* (quoting *Gross*, 129 S. Ct. at 2352).

Traditionally, federal courts have considered disparate treatment age claims under the ADEA and the NYSHRL using the same standard. *See, e.g., Sutera v. Schering Corp.*, 73 F.3d 13, 16 n. 2 (2d Cir. 1995). Following *Gross*, an open question exists as to whether the Supreme Court's decision in *Gross* also applies to claims brought under the NYSHRL. In *Gorzynski*, the Second Circuit Court of Appeals assumed that it did without deciding the issue. 596. F.3d at 106 n.6. In *DeKenipp v. State*, 97 A.D.3d 1068 (3d Dep't 2012), the court declined to determine "whether this recent and more stringent federal standard applies to the analysis of age discrimination under the Human Rights

14

Law." *Id.* at 1070; *see also Mikinberg v. Bemis Co., Inc.*, 555 F. App'x 34, 35 (2d Cir. 2014) ("[W]e have assumed, without deciding, that the ADEA's 'but for' standard of causation also applies to age discrimination claims brought under the NYSHRL. The New York courts have yet to rule definitively on this issue.") (internal citation omitted).

Neither of the parties has briefed this point, but at oral argument on the instant motion Plaintiff's counsel argued that the "but for" standard was not applicable to Plaintiff's NYSHRL claims. The Court does not need to resolve the issue because, as set forth below, Plaintiff has presented evidence sufficient to meet the higher "but for" standard.

### A.   *Prima Facie* Case of Age Discrimination

Defendants argue that Plaintiff cannot establish a *prima facie* case of age discrimination because the undisputed material facts demonstrate that she was not performing her job satisfactorily. (Dkt. 31 at 8). Further, Defendants contend that Plaintiff cannot demonstrate "that she suffered an adverse employment action under circumstances giving rise to an inference of discrimination on the basis of age." (*Id.*). The Court disagrees and finds that, viewing the facts in the light most favorable to Plaintiff, she can establish a *prima facie* case of age discrimination.

### 1.   Qualified for the Position

As to the first point, there are disputed issues of material fact as to whether Plaintiff was performing her job satisfactorily. Defendants cite only two cases in addition

15

to *McDonnell Douglas* – *Stratton v. Department for the Aging for City of New York*, 132 F.3d 869 (2d Cir. 1997), and *Aiossa v. Bank of America, N.A.*, No. 10-CV-1275(JS)(ETB), 2012 WL 4344183 (E.D.N.Y. Sept. 21, 2012), neither of which actually considered what constitutes a showing of satisfactory job performance.   Notably, the defendants in the *Stratton* case conceded that plaintiff had demonstrated the first three elements of a *prima facie* case of discrimination (132 F.3d at 879), while in the *Aiossa* case, plaintiff failed to show circumstances giving rise to an inference of discrimination (2012 WL 4344183 at *2).

"*McDonnell Douglas* requires only a minimal showing of qualification to establish a *prima facie* claim. [Plaintiff] only needs to demonstrate that she 'possesses the basic skills necessary for performance of [the] job.'" *Owens v. N.Y.C. Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991) (quoting *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978)).   To draw the inference of minimal qualification for employment, "all that is required is that the Plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001) ("where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw").

Here, Plaintiff has presented sufficient evidence to permit a jury to conclude that she was qualified for her position.   Plaintiff has submitted evidence showing that from 2002 until 2008, when Mr. Champagne became her supervisor, she was consistently

commended for her performance. (Dkt. 34-7 at 15-29). Moreover, even after Mr. Champagne became her supervisor, Plaintiff has submitted evidence that in many instances, she was among the top performers on her sales team. For example, for the 10-month period from September 2009 to June 2010, Plaintiff was in Carefusion's top 15 sales representatives nationwide. (Dkt. 37 at 29-57).

Moreover, Plaintiff has submitted evidence that her coworkers Erin Palisin, Tom Hjerpe, and Lauren Ghenn also had periods of time in which they ranked near the bottom of Carefusion's sales representatives. (*Id.*). A jury could reasonably conclude from this evidence that some fluctuation in sales was normal and that a period of low sales would not render Ms. Palumbo unqualified for her position. For example, Mr. Hjerpe was ranked 46 out of 52 sales representatives in January 2010, 45 out of 52 in February 2010, 46 out of 52 in March 2010, 47 out of 52 in April 2010, and 46 out of 52 in June 2010. (*Id.* at 51-57). Yet in September 2010, he ranked first in sales, and he ranked second in October 2010, and first in November 2010. (*Id.* at 59-63). These fluctuations in sales performance by one of Plaintiff's coworkers lend credence to her argument that a period of relatively low sales is not sufficient to establish unsatisfactory job performance as a matter of law.

Similarly, Defendants concede that Plaintiff's coworker Erin Palisin was ranked 50 out of 52 sales representatives in September 2010, 49 out of 52 in October 2010, 50 out of 52 in November 2010, 50 out of 51 in December 2010, and 49 out of 51 in January

17

2011, the same time period during which Plaintiff's sales fell. (Dkt. 41 at 6). Yet, Ms. Palisin was not placed on a PIP. (*Id.*). Defendants claim that it is not fair to compare Ms. Palisin and Plaintiff because Plaintiff also demonstrated qualitative deficiencies, but Ms. Palisin's fiscal year 2011 performance review specifically identified organizational problems with which she suffered. (Dkt. 37 at 105).

With respect to the customer complaints against Plaintiff, these complaints address whether Plaintiff was performing to the satisfaction of her customers, not whether she possessed the basic qualifications for her position.   Although these complaints are certainly relevant to Defendants' stated reasons for their actions with respect to Plaintiff, they do not remove the presence of disputed issues of fact as to whether Plaintiff was qualified for the position. *See Slattery,* 248 F.3d at 92.

Regarding Plaintiff's purported paperwork failures, there is no evidence that an occasional failure to submit timely expense reports rendered Plaintiff unfit for her position.   Indeed, Plaintiff's testimony that the other members of her sales team also engaged in this practice suggests that this was not the case. (Dkt. 34-1 at ¶¶ 117-122).

Based on the foregoing, a reasonable jury could conclude that Plaintiff was qualified for her job.

## 2.    Adverse Employment Action

Plaintiff maintains that she was subjected to two adverse employment actions – "(1) her discriminatory placement on a performance improvement plan and subsequent

18

extensions of that plan; and (2) her termination." (Dkt. 34 at 4). There is no dispute that termination constitutes an adverse employment action. *See Feingold v. N.Y*, 366 F.3d 138, 152 (2d Cir. 2004) (examples of adverse employment actions include termination and demotion). However, although Defendants did not raise this issue in their moving papers, defense counsel argued at oral argument on the instant motion that Plaintiff's placement on a PIP did not constitute an adverse employment action.

Arguments raised for the first time at oral argument are waived for purposes of a summary judgment motion. *Monroe v. Xerox Corp.*, 664 F. Supp. 2d 235, 243 (W.D.N.Y. 2009). Moreover, although there is authority for the proposition that placement on a performance improvement plan is in some instances not an adverse employment action, *see, e.g., Brown v. Am. Golf Corp.*, 99 F. App'x 341, 343 (2d Cir. 2004) (affirming grant of summary judgment on basis that placement on a performance improvement plan was not an adverse employment action); *Szarzynski v. Roche Labs., Inc.*, No. 07-CV-6008, 2010 WL 811445, at *7 (W.D.N.Y. Mar. 1, 2010) ("[P]lacing plaintiff on a PIP, the goal of which was to improve his performance and avoid his termination, is not an adverse employment action."), Defendants' failure to timely raise this argument deprived Plaintiff of the opportunity to present evidence regarding the impact of the PIP in this particular case. The Court cannot conclude on the current record that the PIP did not materially worsen the terms and conditions of Plaintiff's employment and/or did not directly or indirectly lead to her termination. *See Byra-Grzegorczyk v.*

19

*Bristol-Myers Squibb Co.*, 572 F. Supp. 2d 233, 252 (D. Conn. 2008) ("[N]egative performance reviews can be considered a part of an adverse action if the negative review leads to a plaintiff's demotion or termination.").

### 3.     Circumstances Giving Rise to an Inference of Discrimination

With respect to Plaintiff's disparate treatment claim, the Court finds that there is evidence in the record sufficient to support Plaintiff's *prima facie* case. Specifically, there is evidence that Mr. Champagne treated younger workers more favorably than Plaintiff with respect to their poor sales performance and Plaintiff was replaced by a significantly younger employee.

Defendants argue that Plaintiff was not similarly situated to Ms. Palisin and Mr. Hjerpe, who also suffered from poor sales performance, because Plaintiff had "qualitative" failures that those individuals did not have. However, as discussed above, there is evidence in the record that Ms. Palisin also suffered from qualitative performance issues. Moreover, "[w]hether two employees are similarly situated ordinarily presents a question of fact for the jury." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (finding that district court's decision regarding similarity of particular employees "improperly resolved factual questions.").

Defendants further claim that there were three younger individuals (Lauren Ghenn, Robert McGee, and Kyle Hatler) who were in fact either counseled, put on a PIP, or terminated due to qualitative failures. (Dkt. 31 at 11). However, the facts regarding

these individuals are contested.  For example, with respect to Mr. Hatler, Plaintiff notes

that he had received an "unsatisfactory" rating for fiscal year 2010 (whereas Plaintiff had

received an "on target" rating) and that he had many years of performance problems.

(Dkt. 44 at 3; Dkt. 47 at 6).   Mr. McGee was accused of mishandling company funds (for

example, charging almost $17,000 to his sample account when the budget was $3,250).

(Dkt. 37 at 8).   Given the disputed issues of fact, the Court cannot determine whether

these individuals were similarly situated to Plaintiff.

Plaintiff has also presented evidence that she was passed over in favor of younger

team members in terms of training.  Defendants do not appear to dispute that on several

occasions, Ms. Palumbo requested training opportunities that were ultimately given to

younger co-workers.[2]   This allegedly preferential treatment of younger individuals

supports Plaintiff's *prima facie* case.

Defendants also emphasize the fact that the individual who replaced Plaintiff was

40 years old and, thus, a member of the protected class.  (Dkt. 31 at 11).  However, the

United States Supreme Court has explained that the relevant inquiry under the ADEA is

---

[2]     In certain circumstances, denial of training may constitute an adverse employment
action for purposes of the federal anti-discrimination statutes.  *See, e.g., Risco v.
McHugh,* 868 F. Supp. 2d 75, 103 (S.D.N.Y. 2012) (considering denial of training claim
in context of Title VII action).  Here, Plaintiff does not argue that the purported denial of
training constituted an adverse employment action.  (*See* Dkt. 34 at 4 (plaintiff was
allegedly subjected to two adverse employment actions – "(1) her discriminatory
placement on a performance improvement plan and subsequent extensions of that plan;
and (2) her termination")).  Nevertheless, Mr. Champagne's decision to repeatedly give
training opportunities to younger employees may be considered as evidence of his
attitude towards older workers.

not whether the individual who replaced plaintiff was a member of the protected class, but whether that individual was significantly younger than plaintiff. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) ("Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class.") (reversing decision that 56-year-old worker who was replaced by 40-year-old worker had not made out a *prima facie* claim for discrimination). Here, Plaintiff was 56 years old when she was terminated and replaced by an individual 16 years younger than her. "The Second Circuit has continuously held that an inference of discrimination arises, for purposes of ADEA defendants' summary judgment motions, when an older qualified employee is replaced by someone younger." *Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 573 (S.D.N.Y. 2010) (collecting cases).

Based on the foregoing, a reasonable jury could conclude that Plaintiff has established a *prima facie* case of age discrimination.

### B. Legitimate, Nondiscriminatory Reasons, Pretext, and But For Causation

Defendants next argue that "Plaintiff's lack of responsiveness to customers and the resulting customer complaints constitute legitimate, nondiscriminatory reasons for the issuance of the PIP to Plaintiff and the decision to terminate her employment." (Dkt. 31 at 11). Plaintiff does not contest that, if true, these reasons would constitute legitimate,

22

nondiscriminatory reasons.   Instead she argues that these reasons were pretextual.   In particular, Plaintiff argues as follows: (1) Defendants argued before the New York State Division of Human Rights (the "NY DHR") that Plaintiff was placed on a PIP for inconsistent sales performance and did not raise the issue of her supposed indifference to her clients until Plaintiff filed her federal lawsuit; (2) Defendants failed to perform an adequate investigation of the complaints from St. James Mercy and Guthrie prior to her termination; and (3) the evidence indicates that the decision to terminate Plaintiff was made well before the Guthrie complaint was received.

Because Plaintiff does not dispute that Defendants' asserted reasons for placing her on the PIP and ultimately terminating her would be legitimate if true, the Court moves to the third step of the *McDonell Douglass* analysis.   In order to prevail on the third step of the *McDonnell Douglass* analysis, "a plaintiff must show that there is a material issue of fact as to whether (1) the employer's asserted reason for discharge is false or unworthy of belief *and* (2) more likely than not [a discriminatory motive] was the real reason for the discharge." *Schnabel v. Abramson*, 232 F.3d 83, 88-89 (2d Cir. 2000) (emphasis in original) (quotation and citation omitted); *see also Colon v. Trump Int'l Hotel & Tower,* No. 10 CIV 4794 JGK, 2011 WL 6092299, at *7 (S.D.N.Y. Dec. 7, 2011) ("[I]n determining whether the plaintiff has met her burden at the third step of the *McDonnell Douglas analysis,* a court is to use a 'case by case' approach that evaluates the strength of the plaintiff's [*prima facie*] case, the probative value of the proof that the

employer's explanation is false, and any other evidence that supports [or undermines] the employer's case.") (quotation omitted).  "'The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct."'" *James v. N.Y.  Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 146 (2000)).  In other words, "[t]he pretextual nature of an employer's explanations does not necessarily entitle a plaintiff to prevail."  *O'Reilly v. Marina Dodge, Inc.*, 435 F. App'x 8, 10 (2d Cir. 2011).

Plaintiff bears the burden of producing "sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that her age was a 'but for' cause of" Carefusion's decision to terminate her employment. *Gorzynski,* 596 F.3d at 107.   Plaintiff's "burden at the third step of analysis require[s] [her] to show more than possible age bias. . . ."  *Fried v. LVI Servs., Inc.*, 500 F. App'x 39, 41 (2d Cir. 2012).  The Court therefore considers whether the evidence presented by Plaintiff in support of her *prima facie* case, combined with the evidence of pretext, is sufficient to permit a reasonable jury to conclude that Plaintiff would not have been terminated "but for" age discrimination.

With respect to pretext, "[d]iscrepancies between the reason a defendant provides in response to [a] . . . discrimination charge, as compared to the reason asserted in

24

employment discrimination litigation action can support a reasonable jury's inference that one of the answers was false and, thus, a pretext for discrimination." *Riley v. HSBC USA, Inc.*, 784 F. Supp. 2d 181, 210 (W.D.N.Y. 2011) (citing *E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir.1994)). Here, the NY DHR's final investigative report makes no mention of any customer complaints against Plaintiff. Instead, it notes that Carefusion claimed Plaintiff was placed on a PIP due to "inconsistent sales performance in 2010" and that Plaintiff "needed to maintain a consistent level of sales activity." (Dkt. 34-9 at 47).

Defendants have failed to produce evidence rebutting Plaintiff's argument that Carefusion only told the NY DHR that Plaintiff was put on a PIP for inconsistent sales performance. Notably, Defendants have not produced the response they submitted to the NY DHR. Instead, Defendants argue that "sales performance" includes "both quantitative *and* qualitative components." (Dkt. 41 at 10) (emphasis in original). Even accepting this argument as true, Defendants have not explained why the customer complaints that they now claim were the most significant evidence of Plaintiff's unsatisfactory performance were apparently never raised before the NY DHR. A rational jury could conclude from this shift in explanations that Defendants have not been entirely truthful regarding the reasons for the PIP.

Plaintiff further argues that the customer complaints from St. James Mercy and Guthrie Health were not properly investigated. In particular, Plaintiff argues that neither

25

Lynda Fouts, Carefusion's Human Resources compliance manager, nor Mr. Champagne ever asked her for an explanation of the complaints. Defendants argue that they directly contacted the individuals who made the complaints and that neither customer wanted Ms. Palumbo as their sales representative any longer, with one customer reporting that Ms. Palumbo had attended only two out of twelve scheduled meetings. (Dkt. 31 at 10).

The Second Circuit Court of Appeals has explained that "questions related to the event precipitating plaintiff's firing and the subsequent investigation" may be an "indicator[] of pretext." *Wolf v. Time Warner, Inc.*, 548 F. App'x 693, 695 (2d Cir. 2013) (citing *Gorzynski*, 596 F.3d at 107-10). Plaintiff has presented evidence from which a rational jury could conclude that Defendants' investigation into the St. James Mercy and Guthrie complaints was not thorough and that Plaintiff was not given an adequate opportunity to present her side of the story. These facts could support an inference that the stated reasons for Plaintiff's termination were pretextual.

Moreover, even though Defendants now cites to a complaint from Guthrie Health as supporting the decision to terminate Plaintiff, the March 2012, email exchange between Mr. Champagne and Arron Retterer suggests that the decision had been made before receiving the complaint from Guthrie Health. The e-mail exchange in question consists of Mr. Champagne asking Arron Retterer how to respond to Plaintiff's request to attend a training session. In response, Mr. Retterer asks about the "timing of the HR decision here," and Mr. Champagne responds "I believe we are looking at mid to late

April." (Dkt. 34-9 at 23). Plaintiff claims that "the HR decision" refers to the decision to terminate her employment. This is a rational reading of the email in question and a rational jury could choose to adopt it.

As a result, there are disputed issues of material fact regarding whether Defendants' stated reasons for placing Plaintiff on the PIP and terminating Plaintiff were pretextual. However, this conclusion does not end the Court's inquiry. The Court must also consider whether the evidence produced by Plaintiff is sufficient to permit a rational jury to conclude that age discrimination was the "but for" cause of Plaintiff's placement on the PIP and termination.

Although this is a close case, the Court concludes that a rational jury could find for Plaintiff as to "but for" causation. With respect to the PIP, Plaintiff has presented evidence that her younger coworkers Ms. Palisin and Mr. Hjerpe suffered from low sales performance yet were not placed on PIPs. The Second Circuit Court of Appeals has made it clear that preferential treatment of younger employees is probative evidence of "but for" causation. *Gorzynski*, 596 F.3d at 108-109. Although Defendants argue that Plaintiff's customer difficulties rendered her fundamentally dissimilar to Ms. Palisin and Mr. Hjerpe, it is ultimately for the jury to decide whether they are valid comparators. *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000).

The age-related remarks allegedly made by Ms. Ghenn in Mr. Champagne's presence also support Plaintiff's claim of intentional discrimination with respect to her placement on the PIP and ultimate termination.

> In determining whether a comment is a probative statement that evidences an intent to discriminate or whether it is a non-probative "stray remark," a court should consider the following factors: (1) who made the remark, *i.e.*, a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.*, whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.*, whether it was related to the decisionmaking process.

*Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 519 (S.D.N.Y. 2004).  In this case, although the remarks at issue were made by a co-worker, they were made in front of and arguably tacitly endorsed by Mr. Champagne.  It is undisputed that Mr. Champagne was Plaintiff's supervisor and a key decisionmaker with respect to her placement on the PIP and her termination.  A reasonable jury could view phrases such as "old fart" and statements such as "you smell" as discriminatory.  The discriminatory statements were allegedly made in the same time frame as Plaintiff's placement on the PIP and termination.  The Court cannot conclude as a matter of law that these statements were nothing more than non-probative stray remarks.

Plaintiff's replacement by a worker 16 years younger than her is also evidence of discriminatory intent.  *See Hopkins v. New England Health Care Employees Welfare Fund*, 985 F. Supp. 2d 240, 258 (D. Conn. 2013) (genuine issue of material fact existed as to whether the plaintiff would have been terminated "but for" her age in part because

28

she was replaced by a worker 16 years younger).  This is particularly the case where Plaintiff was apparently significantly older than all of her co-workers.

"[T]he cumulative weight of this evidence" of discriminatory intent would permit a reasonable juror to find that Plaintiff's age was the "but for" cause of her placement on the PIP and her termination.  *Gorzynski*, 596 F.3d at 109.  Defendants' motion for summary judgment is thus denied as to Plaintiffs' ADEA disparate treatment claim against Carefusion and as to Plaintiff's NYSHRL disparate treatment claim against Carefusion and Mr. Champagne.

## IV.    Hostile Work Environment

Plaintiff also asserts causes of action for a hostile work environment based on the ADEA and the NYSHRL.  These claims are analyzed under the same framework.  *See Preuss v. Kolmar Labs., Inc.*, 970 F. Supp. 2d 171, 184 n. 14 (S.D.N.Y. 2013) ("ADEA and NYSHRL claims for hostile work environment are analyzed under the same standards. . . .")  "To make out a *prima facie* case for hostile work environment, a plaintiff must show that he is a member of a protected class and that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently pervasive to alter the conditions of the victim's employment.'"  *Id.* at 184 (quoting *Francis v. Elmsford Sch. Dist.*, 263 F. App'x 175, 177 (2d Cir. 2008)).

"A work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it.  A plaintiff must also

demonstrate that she was subjected to the hostility because of her membership in a protected class." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (citations omitted).  "To decide whether the [hostile work environment] threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).

Here, the conduct claimed by Plaintiff does not rise to the level of a hostile work environment.  Plaintiff does not allege that Mr. Champagne ever made any derogatory age-related remarks to her, the instances of "harassment" she identifies him as having engaged in were not severe or pervasive, and a few sporadic age-related comments by Ms. Ghenn at sales meetings over the span of several years are insufficient to constitute a hostile work environment.

"Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination.  Otherwise, the federal courts will become a court of personnel appeals." *Alfano*, 294 F.3d at 377 (noting, however, that facially neutral incidents may contribute to the "totality of the circumstances"); *see also Henkin v. Forest Labs, Inc.*, No. 01 Civ. 4255, 2003 WL 749236, at *8 (S.D.N.Y. Mar. 5, 2003) ("The evidence is clear that plaintiff's supervisors

may have been hostile towards her, but there is no evidence that this hostility was because of her protected class. Plaintiff does not show that hostility to her arose out of any animus towards plaintiff based on her religion, national origin, or age. Title VII and the ADEA are not general civility codes."), *aff'd*, 88 F. App'x 478 (2d Cir. 2004).

Here, although Plaintiff claims that Mr. Champagne was unusually harsh toward her, berated her in front of coworkers, and deliberately embarrassed her, the alleged comments and conduct by Mr. Champagne are not age-related on their face. As such, they are of limited value to Plaintiff's claim that she was subjected to a hostile work environment based on her age. *See Alfano*, 294 F.3d at 378 (there must be "some circumstantial or other basis for inferring that incidents [that are] neutral on their face were in fact discriminatory"); *Davis-Molinia v. Port Auth. of N.Y. & N.J.*, No. 08 CV 7584(GBD), 2011 WL 4000997, at *12 (S.D.N.Y. Aug. 19, 2011) (granting summary judgment on a hostile work environment claim because only one of the alleged incidences of harassment (a racist comment made by a non-defendant co-worker) was facially based on a protected class, and there was nothing in the record to link the other facially-neutral instances to discriminatory animus). "The law does not require an employer to like his employees, or to conduct himself in a mature or professional manner, or unfortunately, even to behave reasonably and justly when he is peeved." *Christoforou v. Ryder Truck Rental, Inc.*, 668 F.Supp. 294, 303 (S.D.N.Y. 1987).

31

With respect to Plaintiff's claim that Ms. Ghenn, over a period of several years, called her "old lady," "old fart," told her she smelled, and asked her when she was going to get a wheelchair, there is no evidence in the record that these sporadic age-based derogatory comments were so severe or pervasive as to negatively impact Plaintiff's work environment. Plaintiff was only present at face-to-face meetings with Ms. Ghenn six times between December 2008 and April 2012. (Dkt. 34-5 at 29:20-33:7). As such, any harassment by Ms. Ghenn at these meetings was by definition episodic and not pervasive. *See Coley-Allen v. Strong Health*, 828 F. Supp. 2d 582, 587 (W.D.N.Y. 2011) (party allegedly exposed to a handful of isolated incidents was not subject to a hostile work environment). *See also Reed v. Neopost USA, Inc.*, 701 F.3d 434, 443 (5th Cir. 2012) (affirming grant of summary judgment dismissing hostile work environment claim, even though various coworkers called the plaintiff "names like 'old man,' 'old fart,' 'pops,' and 'grandpa.'").

Even accepting Plaintiff's contention that Mr. Champagne's harsh treatment was motivated by her age, a rational jury could not conclude that Ms. Ghenn's sporadic age-based comments combined with Mr. Champagne having been harsh and disrespectful to Plaintiff on roughly six occasions over three years constituted a hostile work environment. "The incidents [comprising a hostile work environment claim] must be repeated and continuous; isolated acts or occasional episodes will not merit relief." *Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62 (2d Cir. 1992). For

32

example, in *Douglass v. Rochester City School District*, 873 F. Supp. 2d 507 (W.D.N.Y. 2012), *aff'd*, 522 F. App'x 5 (2d Cir. 2013), the plaintiff produced evidence that her supervisor communicated with her in a disrespectful tone, reacted toward her with short-tempered anger, angrily admonished her in front of others, referred to her as "that lady," slammed his hand on a table, left her out of meetings, made false accusations against her, and required her to travel two hours for a meeting. *Id.* at 509. The court granted summary judgment for defendant, explaining that "the sporadic verbal altercations and social snubs plaintiff describes do not indicate conduct so continuous, threatening, or offensive as to comprise a hostile work environment." *Id.*; *see also Alfano,* 294 F.3d at 379 (although "[t]here is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment," a handful of not particularly severe incidents over a substantial time period falls below the threshold).

In this case, the incidents at issue were not particularly severe. They did not involve physically threatening conduct, most of them did not have overtly discriminatory undertones, and even the ones directly involving Plaintiff's age involved only mild name-calling. *See generally Ogiba v. Bus. Servs. Co. of Utica,* 20 F. Supp. 2d 379, 383 (N.D.N.Y. 1998) (use of phrase "old farts" was innocuous). They occurred on a sporadic, isolated basis over more than three years. No rational jury could conclude, on this record, that Plaintiff was subjected to a "workplace environment . . . permeated with such discriminatory intimidation, ridicule, and insult based on her [age] . . . that a reasonable

33

person would find that the terms and conditions of employment were altered." *Benette v. Cinemark U.S.A., Inc.*, 295 F. Supp. 2d 243, 252 (W.D.N.Y. 2003).

The cases cited by Plaintiff in support of her claim are readily distinguishable.  In *Schwapp v. Town of Avon*, 118 F.3d 106 (2d Cir. 1997), the plaintiff was an African-American police officer who was repeatedly exposed to racial slurs and whose supervisor expressly told plaintiff that he was aware of the "racially-hostile situation" but that plaintiff should "accept the fact that he was working with racists and not be 'so sensitive.'"  *Id.*  at 112.  The Second Circuit held that it was this incident that was "most important[]" and that it "weigh[ed] heavily against a grant of summary judgment."  *Id.*  There is no comparable evidence in this case.

*Curtis v. Airborne Freight Corp.*, No. 98 Civ. 4062 (SAS), 1998 U.S. Dist. LEXIS 19636 (S.D.N.Y. Dec. 17, 1998), also relied on by Plaintiff, was decided on a motion to dismiss.  As such, the district court was obligated to credit plaintiffs' claim that they were "continuously subjected to acts of harassment and humiliation," and concluded only that "[t]aken in the light most favorable to plaintiffs, the alleged events may support a claim of a hostile work environment."  *Id.* at *12-13.

At best, Plaintiff has produced evidence that on a handful of occasions over three years, a co-worker made mild age-based comments, and Plaintiff's boss, who never made any age-based remarks, was rude and disrespectful.   No rational jury could find, based on this evidence, that Plaintiff was subjected to a hostile work environment based on her

age by Defendants.  Defendants' motion for summary judgment is therefore granted as to Plaintiff's hostile work environment claims under both the ADEA and the NYSHRL.

## V.    Retaliation

Plaintiff also alleges that Defendants retaliated against her under the ADEA and the NYSHRL.   ADEA and NYSHRL retaliation claims are also analyzed under the *McDonnell Douglas* framework.  *Gorzynski*, 596 F.3d at 110.  "Under the *McDonnell Douglas* analysis, the plaintiff must establish a *prima facie* case of retaliation, which the defendant must rebut with a legitimate reason for the action.  Then the plaintiff carries the ultimate burden of showing that the proffered explanation is really a pretext for retaliation."  *Hannah v. One Communs.*, No. 08-cv-6567L, 2011 WL 5282633, at *9 (W.D.N.Y. Sept. 28, 2011).  Like an ADEA disparate treatment claim, a plaintiff must establish that retaliation was the "but for" cause of the adverse treatment.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 2 (2013).

In order to establish a *prima facie* case for retaliation, the plaintiff must show that: (1) the employee was engaged in a protected activity; (2) the employer was aware of this activity; (3) the employer took adverse action against the employee; and (4) there was a causal connection between the protected activity and the adverse action.  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 177 (2d Cir. 2006).

Plaintiff argues (1) that she was placed on the PIP in retaliation for the MySafeWorkPlace complaint; (2) that the PIP was continued through October 2011 in

35

retaliation for her MySafeWorkPlace complaint and her DHR Complaint; and (3) that she was terminated in April 2012 in retaliation for these complaints.   Defendants have failed to establish their entitlement to summary judgment.

Plaintiff bases her *prima facie* case for retaliation on the temporal proximity between her MySafeWorkPlace complaint in January 2011, and her placement on the PIP less than one month later.   "[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorzynski*, 596 F.3d at 110 (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty*, 252 F.3d 545, 554 (2d Cir. 2001)).   A one month gap between protected activity and an adverse employment action will support an inference of causation. *Id.*   Plaintiff continued to engage in protected activity throughout the remainder of her employment with Carefusion by making and prosecuting her DHR Complaint. *See Holmes v. Donahoe*, No. 10-CV-1031-A-SR, 2014 WL 2882850, at *8 (W.D.N.Y. June 25, 2014) ("protected activity" in the context of a Title VII retaliation claim includes "action by the Plaintiff that is related to filing, prosecuting, or participating in an employment discrimination complaint").

Defendants argue that there is no temporal proximity in this case because Mr. Champagne began working on Plaintiff's PIP before she made her first complaint.   While it is true that Defendants' records indicate that Mr. Champagne began working on the PIP

prior to Plaintiff's complaints, a reasonable jury could find that he did not make the final decision to implement it until after Plaintiff made her first complaint of discrimination. Plaintiff has thus presented sufficient evidence to support a *prima facie* case of retaliation.

Having concluded that Plaintiff can establish a *prima facie* retaliation case, "[t]he analysis for the remainder of the burden-shifting test for the retaliation claims is similar to that of the age discrimination claim discussed above." *Gorzynski*, 596 F.3d at 111. Defendants have articulated legitimate, nondiscriminatory for placing Plaintiff on the PIP and eventually terminating her. Plaintiff has come forward with evidence that these reasons are pretextual and this evidence, combined with the evidence in support of Plaintiff's *prima facie* case, is sufficient to create a triable issue of fact as to whether Defendants retaliated against Plaintiff for complaining about age discrimination. Defendants are therefore not entitled to summary judgment on Plaintiff's NYSHRL retaliation claim against Mr. Champagne or on Plaintiff's ADEA and NYSHRL retaliation claims against Carefusion.

## VI.   Aiding and Abetting Under the NYSHRL

Plaintiff's final claim is that Mr. Champagne aided and abetted Carefusion's discrimination in violation of the NYSHRL.

"The NYSHRL makes it unlawful 'for any person to aid, abet, incite, compel or coerce' acts prohibited by the NYSHRL. . . ." *Petrisch v. HSBC Bank USA, Inc.*, No. 07-

CV-3303 KAM JMA, 2013 WL 1316712, at *21 (E.D.N.Y. Mar. 28, 2013) (quoting N.Y. Exec. L. § 296(6)).  Of course, "an individual cannot be held to have aided or abetted his or her own actions." *Reid v. Ingerman Smith LLP*, 876 F. Supp. 2d 176, 186 (E.D.N.Y. 2012); *see also Raneri v. McCarey*, 712 F. Supp. 2d 271, 282 (S.D.N.Y. 2010) (granting summary judgment on NYSHRL aiding and abetting claim against individual whose "alleged actions give rise to the discrimination claim").  However, Defendants do not raise this point as a basis for their summary judgment motion.  Instead, Defendants simply rely on their arguments attacking the merits of Plaintiff's discrimination claims.  In view of the Court's findings with respect to Plaintiff's discrimination claims, Defendants' motion for summary judgment is denied as to Plaintiff's NYSHRL aiding and abetting claim against Mr. Champagne.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted as to Plaintiff's ADEA disparate treatment and retaliation claims against Mr. Champagne, and as to Plaintiff's ADEA and NYSHRL hostile work environment claims against Mr. Champagne and Carefusion.  The motion is denied in all other respects.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: August 11, 2014
      Rochester, New York

38